NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CEVDET AKSÜT VE OĞULLARI KOLL. STI,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ROBIN A. CAVUSOGLU, HINCKLEY ALLEN & SNYDER LLP, CNC WAREHOUSING LLC, MUNEVVER CAVUSOGLU, GULSUN CAVUSOGLU, AHMET HAMDI CAVUSOGLU, CELIL CAVUSOGLU, HUSEYIN T. CAVUSOGLU, AMERICAN PISTACHIO COMMODITY CORP. d/b/a SUNRISE COMMODITIES, GALIP UNSALAN, ANDREW ROSEN, DAVID COTTAM, MORDY DICKER, HGC COMMODITIES CORP., NORTHEAST IMPORTS INC., CNC TRADING DISTRIBUTION AND WAREHOUSING INC., SONA TRADING LTD., LINDEN PACKAGING CORP., EFE SPECIALTY MARKET, INC., EFE INTERNATIONAL, INC., ZEYNO TRUCKING, INC., APC COMMODITY CORP., UNSALAN PETROL DIS TICARET, CELIL ITHALAT ITHRACAT VE TICARET LTD., STI.,**<br><br>**Defendants.** | Civ. No. 14-3362 (WJM)<br><br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.**

This case is closely related to two older ones: Civ. No. 10-2750 ("*Cevdet Aksut I*"), which is a closed case, and Civ. No. 12-2899 ("*Cevdet Aksut II*"), which is ready to go to trial.  The Court will refer to this case, Civ. No. 14-3362, as "*Cevdet Aksut III.*"  The Court recently issued an opinion in *Cevdet Aksut II* (the "*Cevdet Aksut II* Opinion," ECF No. 74 in Civ. No. 12-2899).  Today's Opinion assumes that the reader is familiar with the *Cevdet Aksut II* Opinion and uses the defined terms that appear in the *Cevdet Aksut II* Opinion.

This is the third iteration of Plaintiff Cevdet Aksut's effort to collect an unpaid debt of approximately $1.1 million.  *Cevdet Aksut III* arises from information Plaintiff discovered during collection proceedings in *Cevdet Aksut I* and discovery during *Cevdet Aksut II*.  In *Cevdet Aksut III*, Plaintiff attempts to improve its odds of collecting by naming Cavusoglu's wife, various import/warehousing corporations that Cavusoglu and his wife wholly owned and controlled (the "Cavusoglu Entities"), and other parties to whom HGC transferred assets during the months of negotiation before the signing of the *Cevdet Aksut I* Settlement Agreement.  *Cevdet Aksut III* seeks damages from HGC's sole customer, Sunrise, as well as its principals (collectively, the "Sunrise Defendants"), and from Plaintiff's counsel for *Cevdet Aksut I*, Hinckley Allen & Snyder LLP.  The *Cevdet Aksut III* Complaint alleges that these parties conspired with Cavusoglu to defraud Cevdet Aksut.

Sunrise and its current principals, co-Defendants Andrew Rosen and David Cottam, have filed this motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Generally speaking, the Complaint alleges that Defendant Huseyin Cavusoglu operated a shell corporation-based RICO enterprise and that the Sunrise Defendants were participants and conspirators in this enterprise.  For the reasons set forth below, the Motion is granted in part and denied in part.

# I.     BACKGROUND

In the background facts below, the Court accepts the allegations in the Complaint as true, as it must on a motion to dismiss.  *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998) (*citing Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

## A. The Sunrise Defendants

The Complaint alleges a close and conspiratorial relationship between the Sunrise Defendants and Cavusoglu.  Sunrise is a Delaware Corporation with its principal place of business in Englewood Cliffs, New Jersey.  (Complaint at ¶ 30).  Since 1992, Cavusoglu has operated an importing operation out of a rented warehouse located at 1200 West Blanke Street in Linden, New Jersey (the "Linden Warehouse").  (Complaint at ¶ 71).  During that time, he has sold his imported foods to but one customer, Sunrise.  (Complaint at ¶ 69).  Sunrise paid the $22,000 monthly rental obligation and the utilities for the Linden Warehosue directly to the landlord.  (Complaint at ¶¶ 73, 77, 79; *Cevdet Aksut II* Opinion at 4).  Cavusoglu allowed Sunrise to store food products in the warehouse.  (Complaint at ¶ 78).

## B.  Cavusoglu and the Sunrise Defendants' Shell Corporation Scheme

The Complaint alleges that the Sunrise Defendants and the Cavusoglu Defendants conspired to use "undercapitalized shell companies as an instrument of . . . fraud."  (Complaint at ¶ 90).  The victims were food suppliers, usually Turkish.  (Complaint at ¶ 83).  After identifying a new, unsuspecting supplier, Cavusoglu would make false representations of his creditworthiness in order to convince the supplier to ship merchandise (usually dried apricots), on credit, to the Linden Warehouse.  (*Id.  See also* Exhibit 7 at ¶ 13).  Because Cavusoglu never intended to pay the supplier, he could sell the merchandise at a deep discount to Sunrise, permitting Sunrise to realize tens of millions of dollars in illegal profits.  (Complaint at ¶ 81).  When the suppliers brought legal actions, Cavusoglu and Sunrise would use the slow pace of litigation to slowly transfer the insolvent company's assets out of its bank account, frequently to other shell companies belonging to Cavusoglu, so that by the time a judgment was entered or a settlement reached, the insolvent company had no more assets to collect.  (Complaint at ¶ 90).

Not every scheme resulted in litigation, but they all involved common elements in addition to the ones stated above.  These included paying kickbacks to co-conspirators in the dried apricot business, making false representations to induce unsuspecting suppliers to do business with Cavusoglu, manufacturing and transmitting fraudulent invoices, and fraudulently transferring funds.  At the conclusion of a scheme, Sunrise and Cavusoglu would form a new shell corporation to continue the same business.  (Complaint at ¶¶ 90, 160, 279, 290, Exhibits 4 and 7).

### C. Fentex, Holsa and Great Lakes Litigation

Several of Cavusoglu's past victims filed lawsuits.  In 2001, Fentex International Corp. filed a RICO/fraud claim against Cavusoglu and several now-dissolved Cavusoglu shell companies in the Southern District of New York. (Exhibit 4).  Fentex was a U.S. commodities trading company and the subsidiary of a large Turkish industrial and financial group.  The Fentex Complaint alleged that Cavusoglu and the President of Fentex had used false invoices and fictitious sales between Cavusoglu shell entities to reward Fentex's president for storing large volumes of apricots in Cavusoglu's Linden Warehouse.  (Complaint, Exhibit 4). After surviving a motion for summary judgment, the Fentex case settled around the time of trial.  Cavusoglu failed to honor the settlement, and the court entered a $1,000,000 Judgment by Confession against Cavusoglu and the named shell companies.  (Complaint at ¶¶ 96-99).

Also in 2001, Holsa, Inc. sued Cavusoglu and several of his shell companies for a scheme in the District of New Jersey that bears similarities to both the Fentex scheme and the Cevdet Aksut scheme.  Holsa was a U.S. agro business that traded dried fruits and nuts from Turkey.  (Exhibit 7 at ¶ 8).  In the Holsa scheme, Cavusoglu was a middle-man.  He bought goods from Holsa on credit and then sold the goods to retailers, remitting payment back to Holsa within 60 days of shipment.  When Cavusoglu began defaulting on obligations, Holsa and Cavusoglu reached an agreement whereby the end retailer would send the purchase order directly to Holsa, Holsa would ship to Cavusoglu, and Cavusoglu would ship to the retailers.  (Complaint, Exhibit 7).  Cavusoglu continued to miss payments, and moreover, he began sending Holsa purchase orders doctored to look like they were from retailers but which Cavusoglu had generated himself.  The goal of the false purchase orders was to induce Holsa to ship Cavusoglu goods when he had no real prospect of re-selling them.  The Holsa matter settled in April 2002 for $600,000. (Complaint at ¶110).

Additionally, in 2008, the Superior Court of New Jersey found Cavusoglu personally liable to Great Lakes International, Inc. for debts incurred in the name of CNC.  (Complaint at ¶ 192).

The *Cevdet Aksut III* Complaint alleges that Sunrise financed the cost of litigations with Fentex, Holsa, and other Plaintiffs who settled out-of-court for much less than the amount owed, as a "cost of doing business" in the illegal Cavusoglu-Sunrise enterprise.  (Complaint at ¶¶ 86-90).

### D. Sunrise's Participation in the Fraudulent Creation and Business Activity of HGC

By 2006, the $1.6 million of outstanding obligations to Fentex and Holsa were weighing down Cavusoglu and his indebted shell companies. (Complaint at ¶¶ 116, 122). Sunrise, specifically, Sunrise's principal Mordy Dicker, told Cavusoglu, "[L]ook, we will – you know, you will close the company and you will form another company, get rid of your debts or whatever, so you start fresh and we will keep you supported." (Exhibit 3 at 28). That new company was HGC.[1] Cavusoglu never put any capital into HGC, (Exhibit 3 at 47-48), but the Complaint alleges that Sunrise gave HGC sums of money to help perpetrate specific parts of the fraud. (Complaint at ¶¶ 86-97, 141-143). The first such infusion of cash came in 2009, when Cevdet Aksut demanded cash against documents for its first shipment of goods to HGC. (Complaint at ¶¶ 141-143). According to the Complaint, Sunrise gave HGC $50,000 "in order to falsely indicate to Plaintiff that HGC was a substantial and credible going concern, when in fact both HGC and the Cavusoglus were insolvent and in massive debt." (Complaint at ¶ 143). At the time that Cavusoglu lured Cevdet Aksut into shipping apricots, pine nuts, and figs on credit, HGC had defaulted on invoice payments of $500,000 and $50,000 to two other Turkish exporters, Erenler and Sekerciler. (Complaint at ¶¶ 47-48).

The scheme to defraud Cevdet Aksut began with Cavusoglu falsely assuring Plaintiffs of his credibility. (Complaint at ¶¶ 137-140). Initially, Cavusoglu paid a kickback to a non-defendant co-conspirator, Aret Museoglu, to contact Plaintiff and to encourage Plaintiff to do business with Cavusoglu. (Complaint at ¶¶ 137, 157-160). Cavusoglu followed up himself with Plaintiff in September 2009. (Complaint at ¶138). Cavusoglu made several false representations in order to induce Plaintiff's shipment of goods to HGC, among them: 1.) that HGC had been in business for over 20 years; 2.) that it is not the practice in the U.S. food-import business to obtain letters of credit or cash against documents; 3.) that he could guarantee payment within 45 days; 4.) that HGC controlled 70-80% of the apricot market in the United States; 5.) that he had never had a problem paying a supplier before; and 6.) that his clients were three "big firms." (Complaint at ¶ 139; *Cevdet Aksut II* Opinion). The truth was that HGC had only been in business for four years, that it was undercapitalized and insolvent, that it had defaulted on payments to two other Turkish exporters, Erenler and Sekerciler, that Great Lakes had an

---

[1] This was HGC Commodities Corp., the New Jersey Corporation. Cavusoglu previously owned a New Hampshire corporation called HGC Commodities Corp. ("HGC I"), which was in existence from 1998 until 2002. (*See* Exhibits 5-6). Cavusoglu dissolved HGC I in 2002, not long after Fentex commenced litigation against HGC I and Cavusoglu.

outstanding judgment against him, that letters of credit and cash against documents are common financing devices in the U.S. food-import business, and that HGC did not control anywhere near 70% of the apricot market. (Complaint at ¶ 140; *Cevdet Aksut II* Opinion). Cavusoglu's representations ultimately worked, and Cevdet Aksut agreed to make the shipments.

For each of the 13 shipments, Cevdet Aksut sent HGC an invoice. (Complaint at ¶ 151; Exhibit 15). Cavusoglu fraudulently altered and falsified the Cevdet Aksut Invoices (the "Falsified Invoices") so as to appear to be the same as the original ones, but with substantially reduced prices for the food products, and then forwarded the Falsified Invoices to Sunrise for "payment." (Complaint at ¶ 152).

Cavusoglu sold the Plaintiff's merchandise to Sunrise at below-market prices, thereby allowing Sunrise to make a substantial profit. (Complaint at ¶¶ 75-76, 155). Cavusoglu never remitted any money to the Plaintiff. (Complaint at ¶ 161). Subsequently, Museoglu admitted to Cevdet Aksut that he knew Cavusoglu to be dishonest at the time Museoglu made his recommendation. (Complaint at ¶ 157). The Complaint states:

> Mr. Museoglu admitted that . . . when he had initially recommended Mr. Cavusoglu, he knew . . . that Mr. Cavusoglu's practice was to promise prompt payment and then renege on the promise, and that Mr. Cavusoglu took unfair advantage of his suppliers whenever the opportunity presented itself. Mr. Museoglu informed [Plaintiff's representative] Mr. Kanyilmaz that Mr. Cavusoglu was a defendant in several lawsuits for failure to pay for goods . . . and that Plaintiff should take care in dealing with Cavusoglu.

(*Id.*). Plaintiff attempted to contact Cavusoglu via phone and email in order to work out a payment plan. Cavusoglu never responded, so Plaintiff filed the *Cevdet Aksut I* lawsuit.

### E. Settlement of *Cevdet Aksut I* and the Stripping of HGC's Assets

In June 2011, Cevdet Aksut settled *Cevdet Aksut I* with HGC for $625,000, to be paid in 14 monthly installments. (*Cevdet Aksut II* Opinion). HGC promptly defaulted, and the Court entered a judgment for $1,123,500 on July 14, 2011. (Complaint, Exhibit 1). The Complaint alleges that during the months it took to negotiate the settlement, Cavusoglu was in the process of transferring $1,000,000

of dollars in HGC's bank account to family members, to offshore Cavusoglu Entities, and to the Sunrise Defendants. (Complaint at ¶ 268). He ultimately dissolved HGC in June 2011, the same month that he settled *Cevdet Aksut I*. (Complaint at ¶ 61; *Cevdet Aksut II* Opinion). In response to an information subpoena sworn on September 27, 2011, Cavusoglu stated he personally had no interests in any business. (Complaint at ¶ 180, Exhibit 20). Plaintiff claims that this is a lie; Cavusoglu was operating a laundromat in Linden when he signed the information subpoena. (Complaint at ¶ 182).

Plaintiff alleges that, in total, $1,000,000 passed through HGC's bank account after the settlement of *Cevdet Aksut I*, with all the assets fraudulently transferred to Cavusoglu's children, wife, other Cavusoglu Entities, and to the Sunrise Defendants, among others. (Complaint at ¶ 268).

**F. The Sunrise Transfer**

In July 2012, the Cavusoglu's Turkish apricot-exporting entity, Celil, sued Sunrise in the Superior Court of New Jersey – Bergen County. (The "Celil Litigation"). (Sunrise Defendants' Exhibit A). Celil was the only plaintiff named in the Celil Complaint. The Celil Complaint sought $126,976.76, an unpaid balance on shipments of apricots.[2]

In December 2012, Sunrise settled the Celil Litigation, along with other unlitigated disputes between Sunrise and Cavusoglu. The parties produced a settlement agreement (the "Sunrise Settlement"). (*See* Exhibit 23). The Sunrise Settlement named Cavusoglu, his wife, and no less than ten Cavusoglu Entities, including HGC, as parties with whom the Sunrise Settlement extinguished certain claims. (*See* Exhibit 23). As a result of the Sunrise Settlement, Sunrise transferred $500,000 to the Cavusoglus. (Exhibit 23). $126,000 was transferred to Celil, which by this time was "inactive and defunct." (Complaint at ¶¶ 201, 205). $374,000 was transferred to CNC, which Cavusoglu claims he dissolved in 2005. (Complaint at ¶¶ 32, 201).

---

[2] Cavusoglu testified that Celil was technically owned by Cavusoglu's wife, Robin Cavusoglu, but Robin Cavusoglu has no qualifications or experience running an export company; rather he testified that it was his company, and his wife was just a figurehead. (Complaint at ¶ 225; see generally Exhibit 3).

### G. Re-Opening of Dissolved Shell Corporations and Perjurous Statements

Within weeks of receiving the $500,000 payment from Sunrise, the Cavusoglus re-established a food importing operation from the Linden Warehouse. (Complaint at ¶ 219).   In February 2013, a Cavusoglu Entity that had been dissolved in 2003, Northeast Imports, received 3 containers of dried apricots at the Linden Warehouse, with each container holding over 43,000 lbs. of food. (Complaint at ¶ 219; *see also Cevdet Aksut II* Opinion (referring to Plaintiff's Exhibit Z (ECF No. 57-7 in Civ. No. 12-2899) ("Exhibit Z")).   On October 13, 2013, Northeast Imports received two more containers at the Linden Warehouse. (Exhibit Z).  Another container arrived on October 29, 2013.  (*Id.*).

In between the two October 2013 shipments, specifically on October 15, 2013, Cavusoglu served a supplemental answer to interrogatory in *Cevdet Aksut II*. (Complaint at ¶ 221).   In that answer, Cavusoglu stated that he has not been employed by or engaged in any commodities importing or distribution companies, other than HGC, from 2008 until the present.  (*Id.*).   Also on October 15, 2013, Robin Cavusoglu formed a new entity in New Hampshire, bearing the same name as a dissolved New Jersey Cavusoglu entity – CNC Warehousing LLC. ("New CNC")  (Complaint at ¶ 222).   The New CNC listed the Linden Warehouse as its place of business.   At his January 16, 2014 deposition, Cavusoglu stated under oath that neither he nor his wife had been involved in any food importing or warehousing since the dissolution of HGC in 2011.   (Complaint at ¶ 224).   He made this statement less than a month after Northeast Imports received a December 12, 2013 container at the Linden Warehouse.  (Exhibit Z).  Between February and March 2014, Northeast Imports received four more containers at the Linden Warehouse.  (Exhibit Z).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted.  The moving party bears the burden of showing that no claim has been stated.  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998) (*citing Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.* at 678.

## III.   DISCUSSION

The Sunrise Defendants characterize the *Cevdet Aksut III* Complaint as nothing more than a third attempt to collect a debt. It is an attempt to collect a debt, but the allegations here go deeper. Plaintiff now claims it was the victim of a RICO enterprise and related conspiracies. The existence of the RICO enterprise and related conspiracies has been plausibly pled and gives rise to various statutory and common law causes of actions against the Sunrise Defendants.

Purported claims against the Sunrise Defendants are: (1) conspiracy to violate the New Jersey Uniform Fraudulent Transfer Act; (2) state and federal RICO violations; (3) aiding and abetting fraud, conversion, and breach of fiduciary duty; (4) civil conspiracy; (5) unjust enrichment; and (6) alter ego liability for HGC's debts. The Complaint adequately alleges facts that survive the motion to dismiss as to some of the causes of action.

### A. New Jersey Uniform Fraudulent Transfer Act

Plaintiff has stated a claim against the Sunrise Defendants for conspiracy to violate the Uniform Fraudulent Transfer Act ("UFTA"). "The purpose of the Fraudulent Transfer Act, N.J.S.A. 25:2-20 to -34, is to prevent a debtor from placing his or her property beyond a creditor's reach." *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463, 475 (1999). "Underlying the Act is the notion that a debtor cannot deliberately cheat a creditor by removing his property

from the jaws of execution." *Id.* "Fraudulent conveyance claims thus allow the creditor to undo the wrongful transaction so as to bring the property within the ambit of collection." *Id.* The UFTA prohibits any transfer intended to hinder, delay, or defraud any creditor of the debtor. N.J.S.A. 25:2-25. In *Banco Popular v. Ghandi*, 184 N.J. 161 (2005), the New Jersey Supreme Court held that a Plaintiff may bring a UFTA cause of action against a third-party who conspires or aids in a fraudulent transfer. *Id.* at 177 ("The UFTA was designed as a vehicle by which creditors may recover from debtors and others who hinder their collection efforts. Yet, in enacting the UFTA, the Legislature specifically opted not to preclude related causes of action."). The elements of a conspiracy to violate the UFTA, therefore, would be an agreement to support or participate in a fraudulent transfer, and an overt act that results in damage. *See LoBiondo v. Schwartz*, 199 N.J. 62, 102 (2009).

Rule 9(b) applies to UFTA claims. *See MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d 426, 434 (D.N.J. 2012) (*citing Ford Motor Credit Co. v. Chiorazzo*, 529 F. Supp. 2d 535, 538 (D.N.J. 2008)). The Sunrise Defendants argue, without merit, that the Complaint does not meet the Rule 9(b) specificity requirement. Rule 9(b) requires plaintiffs to state the circumstances of the alleged fraud with sufficient particularity to place the Defendant on notice of the "precise misconduct with which [it is] charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (*quoting Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)) (internal quotations omitted). "The most basic consideration in judging the sufficiency of a pleading is whether it provides adequate notice to an adverse party to enable it to prepare a responsive pleading." *Harkes v. The Accessory Corp., Inc.*, 2010 WL 919616, at *5 (D.N.J. March 10, 2010). "Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (*quoting Christidis v. Pennsylvania Mortgage Trust*, 717 F.2d 96, 99-100 (3d Cir. 1983)); *see also Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir. 1998) ("Courts should . . . apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.").

Here, Count 2 plausibly and specifically states that the Sunrise Defendants were parties that knowingly accepted assets that Cavusoglu siphoned out of HGC in an effort to prevent Plaintiff from collecting its $1.1 million judgment. (Complaint at ¶ 268). Given the allegedly close financial and personal ties between Cavusoglu and the Sunrise Defendants, it is plausible that the Sunrise

Defendants received transfers from HGC that it knew to be transferred for the purposes of keeping the assets away from a judgment creditor.

## B. RICO

Congress and the New Jersey Legislature both enacted RICO statutes to eradicate organized crime. *See State v. Ball*, 141 N.J. 142, 156 (App. Div. 1993); *United States v. Turkette*, 452 U.S. 576, 589 (1981) (*citing* 16 Cong. Rec. 602, 819, 35199, 35300 (1970)). Nevertheless, RICO is not limited to "traditional" notions of organized criminal activity. *Maxim Sewerage Corp. v. Monmouth Ridings*, 273 N.J. Super. 84, 92 (Ch. Div. 1993) (*citing H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 *U.S.* 229, 243-49, (1989)). Its reach is not limited to "mobsters." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985). In enacting RICO, Congress wanted to reach both illegitimate enterprises and legitimate enterprises infiltrated by criminal activity. *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 262-63 (3d Cir. 1995) (*citing Sedima v. Imrex Co.,* 473 U.S. 479 (1985)).

The RICO private rights of action are contained in 18 U.S.C. § 1964(c) and its New Jersey counterpart, N.J.S.A. 24C:41-4c. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008); *United Support Solutions v. LaPierre*, No. CIV. 14-2842 FSH, 2014 WL 3058561, at *2 n. 2 (D.N.J. July 7, 2014). A RICO plaintiff may recover treble damages and attorneys fees under both the state and federal RICO causes of action. *Maxim Sewerage Corp. v. Monmouth Ridings*, 273 N.J. Super. 84, 93-94 (Ch. Div. 1993); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1187 (3d Cir. 1993).

The federal statute served as an initial model for the New Jersey statute. *State v. Ball*, 141 N.J. at 156. New Jersey's mimicry of the federal RICO statute is apparent in the parallel structure and substance of the state RICO statute, N.J.S.A. 2C:41-2 and the federal statute, 18 U.S.C. § 1962. *See Ball*, 141 N.J. at 156. Both statutes contain four subsections, (a)-(d), laying out four methods of establishing RICO liability. The language of the subsections in both state and federal statutes are virtually identical.

Subsection (c) of both state and federal RICO statutes prohibits the use of a business entity to perpetuate economic crimes classified as "racketeering" in the definitional section of the state and federal statutes. N.J.S.A. 2C:41-1; 18 U.S.C § 1961. *See also United States v. Turkette*, 452 U.S. 576, 580-97 (1981) (explaining the subsections of 18 U.S.C § 1962); *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002) ("The statute defines racketeering by a list of criminal activities that constitute predicate acts for purposes of RICO."). The Supreme Court has stated

that a violation of § 1962(c) requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Subsection (d) prohibits conspiracy to commit any of the RICO acts outlawed in subsections (a) through (c). *See Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 316 (D.N.J. 2005).

"Except where inconsistent with [New Jersey Supreme Court and Appellate Division decision], New Jersey will . . . look to federal decisions interpreting RICO." *Maxim Sewerage Corp. v. Monmouth Ridings*, 273 N.J. Super. 84, 91 (Law Div. 1993) (*citing State v. Ball*, 268 N.J. Super. 72, 103 (App. Div. 1993); *State v. Passante*, 225 N.J. Super. 439, 449 (Law Div. 1987)). *See also State v. Ball*, 141 N.J. at 156 ("[B]ecause the federal statute served as an initial model for our own, we heed federal legislative history and case law in construing our statute).

The Sunrise Defendants make three arguments for the dismissal of the RICO conspiracy claims: (1) failure to meet the federal "distinctiveness" requirement; (2) lack of RICO standing; (3) failure to plead with specificity. None of these are persuasive.

### 1. Distinctiveness

Under 18 U.S.C. § 1962(c), the RICO enterprise must be "distinct" from the RICO defendants themselves.[3] *Glessner v. Kenny*, 952 F.2d 702, 712 (3d Cir. 1991). The basis for this rule is the text of Section 1962(c) itself.[4] *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 263 (3d Cir. 1995). Section 1962(c) states that it is unlawful "for any *person* [to be] employed by or associated with any [RICO] *enterprise*." The Supreme Court has held that this clause requires the Complaint to allege the existence of "two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Kushatner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). The Third Circuit first formulated this rule in *Hirsch v. Enright Refining Co.*, 751 F.2d 628,

---

[3] This distinctiveness rule does not apply to New Jersey RICO. *See Maxim Sewerage Corp. v. Monmouth Ridings*, 273 N.J. Super. 84, 94-96 (Ch. Div. 1993).

[4] The Third Circuit initially held in *Hirsch v. Enright Refining Co.*, 751 F.2d 628 (3d Cir.1984) that the distinctiveness rule was based on two considerations: the literal meaning of the text itself and the Third Circuit's belief that Congress intended the law to punish only outside criminals who infiltrated legitimate organizations. The Supreme Court foreclosed the second rationale in *Sedima v. Imrex Co.*, 473 U.S. 479 (1985), where it held that Congress's intent for RICO was more expansive. The Supreme Court held that Congress intended RICO to also punish "respected businesses allegedly engaged in a pattern of specifically identified criminal conduct." *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 263 (3d Cir. 1995) (*citing Sedima*, 473 U.S. at 499).

633 (3d Cir. 1984).   *Jaguar Cars*, 46 F.3d at 262. "In *Enright,* a jewelry manufacturer brought an action alleging . . . violation of § 1962(c) against a lone defendant – a corporation engaged in metal refining."   *Id.* (*citing Enright*, 751 F.2d at 633).   The Third Circuit concluded that the defendant metal refining corporation could not be liable under § 1962(c) because the "person" charged with liability in *Enright*, the corporate defendant, was the same entity as the entity fulfilling the enterprise requirement.   *Jaguar*, 46 F.3d at 262 (*citing Enright*, 751 F.2d at 633).

The *Cevdet Aksut III* Complaint very clearly alleges a RICO enterprise separate from the individual Defendants.   The enterprise consisted of a shell corporation scheme involving the following components:

- Cavusoglu misrepresenting his creditworthiness to unsuspecting exporters, who would rely on his misrepresentations and ship goods to his shell companies on credit with the expectation of payment.

- Cavusoglu selling the fraudulently-obtained merchandise to Sunrise well-below market price, permitting Sunrise to make large ill-gotten profits.

- Sunrise financing the litigation brought against Cavusoglu by defrauded exporters as a "cost of doing business" with Cavusoglu.

- Cavusoglu using the litigation as a delay tactic so that he could siphon assets for personal use.

- Dumping the shell corporation when a judgment was entered so that the creditor could not collect.

- Opening a new shell corporation (or reviving a dissolved one) to begin the cycle again.

The separate "persons" who operated the enterprise were Cavusgolu and his wife, the Cavusoglu Entities, Andrew Rosen, David Cottam, Mordy Dicker, and Sunrise. Thus, the Sunrise Defendants' argument that the case violates the *Enright* distinctiveness rule is meritless.

### *2. Standing*

RICO standing has two components: (1) an "out-of-pocket loss" and (2) proximate causation. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). The Sunrise Defendants unpersuasively argue that Plaintiff has not pled either.

A RICO injury must be an "actual monetary loss" or an "out-of-pocket loss." *Id.* Plaintiffs who have been repaid have not suffered an "out-of-pocket loss." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000). The Plaintiff must also demonstrate that the loss was a "proximate result" of the RICO violation. *Bridge v. Phoenix Bond*, 553 U.S. at 654. Proximate causation in the RICO context means that the out of pocket loss is a "direct result" of the RICO violation, "as distinct from other, independent factors." *Id.*

The Plaintiff has standing. The actual monetary loss is the $1.1 million worth of goods Plaintiff has not been paid for. The Sunrise Defendants' purchasing Cevdet Aksut's goods from Cavusoglu is one example of how the Sunrise Defendants proximately caused Plaintiff's loss.

### *3. Specificity*

Fraud-based RICO pleadings must comply with Rule 9(b)'s specificity requirements. *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004). The Complaint's RICO allegations meet the Rule 9(b) requirements. While it is true that Plaintiff has not stated specifically what Rosen did and what Cottam did, the Complaint still satisfies Rule 9(b) because it puts them on notice of the charges against them such that they can prepare a responsive pleading. *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007); *Harkes v. The Accessory Corp., Inc.*, 2010 WL 919616, at *5 (D.N.J. March 10, 2010). Moreover, Plaintiff cannot be expected to know exactly what roles Rosen and Cottam played in the RICO enterprise or RICO conspiracy without the benefit of discovery.

### C. AIDING AND ABETTING CLAIMS

The Complaint sets forth three causes of action against the Sunrise Defendants for aiding and abetting the tortious conduct of Cavusoglu and the Cavusoglu Entities: (1) aiding and abetting conversion (Sixth Count); (2) aiding and abetting breach of fiduciary duty (Seventh Count); and (3) aiding and abetting fraud (Eighth Count).

New Jersey and the Third Circuit have adopted the aiding and abetting standard of the Restatement (Second) of Torts. *See Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir. 1998) (*citing Judson v. Peoples Bank Trust & Co.*, 25 N.J. 17 (1957)). The Restatement "provides that a person is liable for harm resulting to a third person from the conduct of another when he 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . .'" *Failla*, 146 F.3d at 158 (quoting the Restatement (Second) of Torts § 876(b)). Comment (c) to this Section states that "it is essential that the conduct of the actor be in itself tortious. One who innocently, rightfully and carefully does an act that has the effect of furthering the tortious conduct or cooperating in the tortious design of another is not for that reason subject to liability." *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Communications Intern., Inc.*, 387 N.J. Super. 469 (App. Div. 2006) (quoting the Restatement (Second) of Torts § 876(b) Comment (c)). In other words, aiding and abetting does not punish a mere agreement, for that is the purpose of a conspiracy cause of action. *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, No. CV 7906-VCG, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014) ("[A]iding and abetting is a cause of action that focuses on the wrongful act of providing assistance, unlike civil conspiracy that focuses on the agreement.").

Generally, in order to state a cognizable claim for aiding and abetting under New Jersey law, the plaintiff must plead facts sufficient under the applicable pleading standard to support (1) the commission of a wrongful act; (2) knowledge of the act by the alleged aider-abettor; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing. *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir. 2003) (*citing Monsen v. Consol. Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir. 1978)).

The claims for aiding and abetting breach of fiduciary duty and conversion will be dismissed because the Court already determined in the *Cevdet Aksut II* Opinion that Plaintiff does not have an underlying claim for breach of fiduciary duty or conversion against Cavusoglu.

With regard to the remaining aiding and abetting fraud claim, Plaintiff argues that the pleadings do not meet the *Iqbal/Twombly* plausibility standard. Relying on factual analogy to the influential antitrust case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), Plaintiff argues that Cevdet Aksut's allegations of aiding and abetting are implausible because they are merely

consistent with illegal behavior, but even if accepted as true, do not create a set of facts that make the existence of aiding and abetting anything more than a matter of speculation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (*explaining Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The analogy to *Twombly* is inapposite.

The facts of *Twombly* are particular to a certain brand of claim that arises under the Sherman Antitrust Act. *See Twombly*, 550 U.S. at 553 ("We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct."). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). The plaintiffs in *Twombly* alleged that the defendants, regional telephone companies, had conspired not to compete with each other after the 1996 Telecommunications Act withdrew government support for their regional monopolies. *Id.* at 549. The factual basis for the conspiracy claim was simply that these companies had not begun to compete with each other. The Court held that it could not plausibly infer a conspiracy from the mere fact of non-competition in the telecommunications market. The Court noted that there were high free market barriers to competition in that industry, making the mere fact of non-competition an implausible indication of an illegal agreement not to compete. *Id.* at 552, 567-69.

In contrast, the facts alleged in the Plaintiff's Complaint, if proven, demonstrate that the Sunrise Defendants probably knew they were assisting Cavusoglu's fraud. The special favors that Sunrise conferred upon Cavusoglu and the Cavusoglu Entities were not those that one corporation usually confers upon another in an arms-length relationship. If Sunrise and Cavusoglu had an arm's length relationship, Sunrise would probably not have been paying Cavusoglu's litigation expenses, paying the cost of Cavusoglu's warehouse rental directly to Cavusoglu's landlord, and offering Cavusoglu financial assistance to keep his operation going under the guise of a new shell entity when CNC became insolvent. A likely explanation for these favors was the fact that Cavusoglu offered Sunrise steeply discounted prices, and Sunrise, as a sophisticated purchaser, should have been aware that these prices were not the result of legitimate practices, especially when Sunrise knew that Cavusoglu had a long history of not paying exporters. The facts alleged do create the plausible inference that Sunrise knew of Cavusoglu's fraud and knowingly participated in it.

### D. CIVIL CONSPIRACY

Civil conspiracy is alleged as a separate cause of action (Ninth Count). Typically, the necessary elements of an aiding and abetting claim will satisfy the

elements of a civil conspiracy claim.  *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, No. CV 7906-VCG, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014) ("It is not clear to me that—in the fraud context . . . a litigant would be likely to show aiding and abetting without incidentally having shown the elements of civil conspiracy were satisfied.").  Such is the case here.  Given the Court's conclusion that the Plaintiff has stated a claim for aiding and abetting fraud, this Opinion need not separately analyze the civil conspiracy claim.

### E. ALTER EGO / PIERCING THE CORPORATE VEIL

The Court recited the legal standard for piercing the corporate veil in the *Cevdet Aksut II* Opinion.  The Court now relies upon and incorporates that same legal standard here to find that Plaintiff has not stated a claim for alter ego liability against Sunrise.

Lacking here is a unity of ownership and interest between Sunrise and HGC. The Complaint alleges a relationship between HGC and Sunrise that is close and conspiratorial, but the two were not one and the same.  It is true that HGC financially relied upon Sunrise for its existence.  Sunrise gave money to HGC that was to be used for illicit purposes.  The Complaint plausibly alleges that Sunrise was outsourcing the legal risks of defrauding Turkish exporters onto HGC.  But the key beneficiary of the assets in HGC's bank account was Cavusoglu – not the Sunrise Defendants.  Sunrise's profits in the scheme were limited to the profit margin it could make reselling the goods it purchased from HGC.  It is Cavusoglu, rather than Sunrise, whom the Complaint claims was raiding the assets of HGC for personal use.  The appropriate remedy for holding Sunrise liable for its behavior sounds in RICO, conspiracy, and aiding and abetting, not in alter ego liability.

### F. UNJUST ENRICHMENT

Courts employ the fiction of quasi or constructive contract with caution. *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 108 (App. Div. 1966). In the *Cevdet Aksut II* Opinion, this Court determined that it would be inappropriate to employ it in this case, where the existence of injustice hinges upon the intent of the Defendants, not on the gains or losses of the parties.  Absent fraudulent intent of the defendants, Plaintiffs are at fault for a poor and unfortunate business decision.

## IV. CONCLUSION

For the reasons set forth above, the Motion to Dismiss is granted in part and denied in part.  The Motion is granted with respect to Plaintiff's claims for aiding and abetting breach of fiduciary duty, aiding and abetting conversion, alter ego liability, and unjust enrichment.   The Motion is otherwise be denied.

/s/ William J. Martini

_____

**WILLIAM J. MARTINI, U.S.D.J.**

**Date: July 14, 2015**